**In re Joe Frank FORD, Sr., Debtor.**

**Joe Frank Ford, Sr., Plaintiff,**

**v.**

**A.C. Loftin, The L & R Company of Rome, Inc., a/k/a L & R Corporation of Rome, Inc., and Jefferson Associates, L.L.C., a/k/a Jefferson & Associates, LLC., Defendants.**

**Bankruptcy No. 02–50780–PWB.**
**Adversary No. 02–5047.**

United States Bankruptcy Court,
N.D. Georgia,
Rome Division.

Aug. 1, 2003.

---

Brian R. Cahn, Perrotta & Associates, P.C., Cartersville, GA, for Joe Frank Ford, Sr.

J. Bryant Durham, Jr., Rome, GA, for A.C. Loftin.

Wade C. Hoyt, IV, The Hoyt Firm, Rome, GA, for The L & R Company of Rome, Inc.

Susan E. Edlein, Holland & Knight LLP, Atlanta, GA, for Jefferson Associates L.L.C.

## MEMORANDUM OPINION

PAUL W. BONAPFEL, Bankruptcy Judge.

Joe Frank Ford, Sr., the chapter 13 debtor in this case and plaintiff in this adversary proceeding ("Debtor"), claims a beneficial ownership interest in his residence, record title to which he transferred several years ago to his daughter so that she could obtain a loan from a bank, with the real estate as collateral, for his benefit. Defendant A.C. Loftin held a note secured by a deed to secure debt encumbering the residence that the debtor executed long before the transfer of record title to his daughter. After the Debtor filed his chapter 13 petition and Mr. Loftin received notice of it, Mr. Loftin conducted a foreclosure sale at which the successful bidder was Defendant L & R Company of Rome, Inc. ("L & R"). Shortly thereafter, L & R sold the residence to Defendant Jefferson Associates, LLC ("Jefferson").

Debtor contends that the foreclosure sale violated the automatic stay of 11 U.S.C. § 362(a) and that, as such, the foreclosure deed to L & R and subsequent deed to Jefferson are void and without legal effect. Defendants contend that the stay was not applicable to the foreclosure sale because the Debtor did not have a beneficial ownership interest in the residence. Alternatively, Defendants contend that, even if the stay applied, the transfers are unauthorized postpetition transfers that cannot be avoided under the good faith purchaser defense of 11 U.S.C. § 549(c) because the Debtor never recorded a copy of his bankruptcy petition in the real estate records. In this regard, Defendants assert that the successful bid at the foreclosure sale meets the requirement of the § 549(c) defense that a good faith purchaser provide "present fair equivalent value" in exchange for an unauthorized postpetition transfer. The controversy is a core proceeding as defined in 28 U.S.C. § 157(b) over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), (e).

The Court conducted a trial limited to the issues of the validity of the foreclosure sale and the subsequent transfer and the claim of the second purchaser against the Debtor for rent. If the Debtor prevailed on these issues, the parties agreed that the Court would determine questions regarding the Debtor's remedies and the cross-claims of the purchasers for indemnification in later proceedings.

Following the trial, the Court announced its findings of fact and conclusions of law. The Court found as a matter of fact that the Debtor had transferred legal title to

his residence to his daughter for the purpose of enabling her to obtain a loan with the residence as collateral for his exclusive benefit, with the daughter later to reconvey at least a life estate in the residence to the Debtor. Based on these facts, the Court concluded that an implied trust arose pursuant to which the Debtor has a beneficial ownership interest in the residence that is property of his estate and that the automatic stay of § 362(a) therefore applies to the foreclosure sale.

The Court then determined that § 549(c) applies only to transfers that are avoidable under § 549(a) and that it does not apply to a transfer that violates the stay. Alternatively, the Court concluded that, even if § 549(c) were applicable, the consideration paid at a regularly conducted foreclosure sale does not establish the payment of "present fair equivalent value" as required by § 549(c). For these reasons, both the foreclosure and subsequent sales were void and legally ineffective. Debtor consequently owes no rent.

This Memorandum Opinion supplements and further explains the Court's rulings and, together with the findings of fact and conclusions of law announced at the conclusion of the trial, constitutes the Court's findings of fact and conclusions of law pursuant to FED.R.CIV.P. 52(a), applicable in this adversary proceeding pursuant to FED. R. BANKR.P. 7052.

## I. STATEMENT OF ISSUES

The Court addresses these issues:

1. Does Debtor have a beneficial ownership interest in his residence, record title to which is in his daughter, that is property of his estate such that the automatic stay of 11 U.S.C. § 362(a) applies to the postpetition foreclosure sale?

2. If so, does 11 U.S.C. § 549(c) provide a defense to the Debtor's action to set aside the transfers due to the violation of the stay? This issue involves two questions. First, is § 549(c) applicable at all? Second, does the sales price at the foreclosure sale constitute "present fair equivalent value" in exchange for the transfer as required to invoke the § 549(c) defense?

3. If the § 362(a) automatic stay applies and the § 549(c) defense is not available, should the Court grant retroactive relief in the form of annulment of the stay under § 362(d) in order to uphold the transfers?

## II. FACTS

The Appendix contains a detailed discussion of the evidence and the Court's findings of fact. The following is a summary of the material facts necessary for application of the controlling legal principles.

The Debtor acquired real estate known as 6 Springdale Drive, Rome, Georgia, in August, 1978. Now 61 years old, the Debtor has lived in his residence continuously for some 24 years.

In connection with the purchase of the residence, the Debtor executed two security deeds. The first priority security deed was in favor of Home Federal Savings and Loan Association of Rome, and the second priority security deed was in favor of A.C. Loftin, the foreclosing creditor in this proceeding. The first priority security deed eventually came to be held by First Union Bank ("First Union"). Mr. Loftin's security deed secured a debt in the original principal amount of $6,222.39, payable with interest at 9½ percent per annum in monthly installments, with the last payment being due on January 1, 1997.

In August 1998, the Debtor was facing foreclosure on the residence by First Union. In order to obtain funds to prevent that foreclosure, the Debtor's daughter, Kathy Ford Wright, attempted to arrange a loan for him from a branch of Nations Bank (now Bank of America) in Carters-

542

ville, Georgia (the "Bank"). The Bank told her that it could not make a loan to the Debtor because his only income was social security disability payments but that it could lend her the money if she had title to the residence. Ms. Wright reported this to her father, and they agreed that he would transfer title to her so that she could get the loan, following which she would re-convey at least a life estate to him. Ms. Wright obtained the loan, and the debt to First Union secured by the first security deed was satisfied. Ms. Wright paid nothing in exchange for the transfer of record title to her. The Bank received a security deed on the residence from Ms. Wright, on which the present balance is approximately $12,000.

Ms. Wright and the Bank were unaware of Mr. Loftin's security deed, and the Debtor apparently thought it had been discharged in a previous bankruptcy case filed around 1981 or otherwise paid. In April 2002, Ms. Wright went back to the Bank to request an additional loan for repairs and improvements to the residence. This time, the Bank reported that a title search had revealed Mr. Loftin's security deed. In fact, Mr. Loftin was advertising the property in April for a nonjudicial foreclosure sale on May 7, 2002.

On April 29, 2002, the Debtor filed his chapter 13 bankruptcy case but did not record a copy of the petition in the real estate records. Although Mr. Loftin received notice of the chapter 13 filing, he proceeded with the foreclosure sale. L &

R purchased the residence at the foreclosure sale for $19,653.70. Thereafter, L & R sold the property to Jefferson for $31,000.

The Debtor's schedules show a value of $60,000 for the residence. The Debtor testified that he thought the residence was appraised for tax purposes for $55,000 and that he thought it was worth at least $40,000. The Defendants produced no evidence of value other than the sales prices.

### III. DISCUSSION

#### A. The Automatic Stay and Debtor's Ownership Interest.

Under 11 U.S.C. § 362(a), the filing of a bankruptcy petition operates as an automatic stay, applicable to all entities, of, among other things, "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). The stay arises automatically by operation of law and is effective regardless of whether affected parties have notice of the bankruptcy filing[1] or the subject property is listed in the debtor's list of assets.[2] The stay does not, however, apply to a foreclosure on property that secures a debt the debtor owes if the encumbered property is not property of the estate.[3] Thus, the first question is whether the Debtor has an interest in the residence that is property of his estate.

The Debtor transferred record title to his daughter for no consideration so that she could obtain a loan for his benefit with the understanding that she would reconvey

1. E.g., Jones v. Garcia (In re Jones), 63 F.3d 411, 412 n. 3 (5th Cir.1995), cert. denied, 517 U.S. 1167, 116 S.Ct. 1566, 134 L.Ed.2d 666 (1996); Job v. Calder (In re Calder), 907 F.2d 953, 956 (10th Cir.1990); In re Ward, 837 F.2d 124 (3d Cir.1988); Elbar Invs., Inc. v. Pierce (In re Pierce), 272 B.R. 198, 203 n. 6 (Bankr.S.D.Tex.2001); 3 COLLIER ON BANKRUPTCY ¶ 362.02 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2003).

2. D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso), 211 B.R. 508, 515 (Bankr.E.D.Pa. 1997).

3. E.g., Everchanged, Inc. v. First Nationwide Mortgage Corp. (In re Everchanged, Inc.), 230 B.R. 891 (Bankr.S.D.Ga.1999).

at least a life estate to him. She obtained the loan and used the proceeds to pay off the existing security deed held by First Union that was about to be foreclosed. In the meantime, the Debtor maintained continuous occupancy of the property as his residence. The facts in this proceeding are sufficient to establish that the Debtor has a continuing beneficial ownership interest in the residence on the basis of an implied trust under Georgia cases such as *Hancock v. Hancock*, 205 Ga. 684, 54 S.E.2d 385 (1949), and *Williams v. Whitfield*, 242 Ga. 639, 250 S.E.2d 486 (1978).

■ Property of the estate under 11 U.S.C. § 541(a)(1) includes (with certain exceptions not relevant here), "all legal or equitable interests of the debtor in property as of the commencement of the case." It includes a beneficial interest in real estate to which a debtor is entitled under an implied trust. *Davenport v. S.I. Securities (In re Davenport)*, 268 B.R. 159 (Bankr.N.D.Ill.2001).[4] Consequently, the postpetition foreclosure sale that Mr. Loftin conducted violated the automatic stay of § 362(a).

■ The Eleventh Circuit has ruled that transactions or occurrences, in violation of the automatic stay of § 362(a) are void, but may be validated through annulment of the stay pursuant to § 362(d). *Borg–Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir.1982); *Alba-*

*ny Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 675 (11th Cir.1984). Other circuits have reached the same conclusion,[5] although some have decided that the stay renders transactions or occurrences only voidable because they are subject to validation through annulment of the stay.[6] The distinction appears to be largely semantic as a substantive matter; the consistent result is that transactions or occurrences in violation of the stay, whether void or voidable, are invalid and without legal effect unless and until the stay is annulled through retroactive relief from it. *See, e.g., Elbar Investments, Inc. v. Pierce (In re Pierce)*, 272 B.R. 198, 208–09 (Bankr.S.D.Tex.2001).

■ Because the foreclosure sale violated § 362(a), it is void under Eleventh Circuit principles and as such has no legal effect. Thus, the deed under power of sale executed by Mr. Loftin in favor of the first purchaser, L & R, is likewise void and has no legal effect. *E.g., In re Ward*, 837 F.2d 124, 126 (3d Cir.1988); *New Orleans Airport Motel Associates, Ltd. v. Lee (In re Servico, Inc.)*, 144 B.R. 933 (Bankr. S.D.Fla.1992). Because L & R thus could not, and did not, acquire title to the residence, L & R had nothing to convey to the second purchaser, Jefferson, and it did not acquire title, either. DANIEL F. HINKEL, PINDAR'S GEORGIA REAL ESTATE LAW AND PROCEDURE § 19–20 (5th ed.1998).[7]

---

**4.** Cf. *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso)*, 211 B.R. 508 (Bankr.E.D.Pa.1997) (stay applies to tax sale if debtor has ownership interest in real estate even if record title is in deceased persons).

**5.** E.g. *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 976 (1st Cir.1997); *In re Siciliano*, 13 F.3d 748, 750 (3d Cir.1994); *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir.1992).

**6.** E.g. *Jones v. Garcia (In re Jones)*, 63 F.3d 411, 412 and n. 3 (5th Cir.1995); *Easley v.*

*Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir.1993).

**7.** Although the daughter is not a debtor in a bankruptcy case protected by a § 362 automatic stay, the foreclosure sale did not extinguish any interest she has for two reasons. First, the automatic stay operates to prevent any action that would affect property in which a debtor has an ownership interest, even if others have an ownership interest in the same property. E.g., *In re Ward*, 837 F.2d 124, 125–126 (3d Cir.1988); *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso)*, 211 B.R.

## B. The Good Faith Purchaser Defense Under § 549(c).

The Defendants contend, however, that the Debtor cannot avoid the transfers that resulted from the foreclosure sale, notwithstanding its invalidity under § 362(a), because the purchasers are entitled to the protections afforded to good faith purchasers under 11 U.S.C. § 549(c). Section 549(c) provides in pertinent part:

The trustee may not avoid under [11 U.S.C. § 549(a) ] a transfer of real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy of the petition was filed, where a transfer of such real property may be recorded to perfect such transfer, before such transfer is so far perfected that a bona fide purchaser of such property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to the interest of such good faith purchaser.

Because Debtor never filed a copy of his petition in the real estate records, Defendants contend § 549(c) protects the transfers to the purchasers. The Debtor responds, however, that § 549(c) applies only to actions to avoid a postpetition transfer under § 549(a) and not to actions such as his that assert violations of the § 362(a) automatic stay that render the transfers void and thus not subject to avoidance under § 549(a). Moreover, even if § 549(c) is applicable, the Court must determine whether the purchasers paid "present fair equivalent value" such that they are entitled to claim its protections.

### 1. Applicability of § 549(c) to Transfer In Violation of § 362(a).

Courts have disagreed as to whether § 549(c) applies to protect a purchaser at a postpetition foreclosure or tax sale conducted in violation of the automatic stay of § 362(a). Some decisions have decided that § 549(c) is an exception to § 362(a),[8] including two in this district.[9] These courts have generally assumed (many without any analysis) that a postpetition foreclosure or tax sale is a postpetition transfer and that, as such, the provisions of § 549(c) provide protection to good faith purchasers at such a sale if they do not have notice of the bankruptcy case and the petition is not filed in the real estate records.

508 (Bankr.E.D.Pa.1997). Second, Mr. Loftin conducted a foreclosure sale of the entire, fee simple interest in the residence; the foreclosure sale cannot be reconstructed as a sale only of whatever interest the non-debtor had.

**8.** *E.g., In re Taylor,* 884 F.2d 478 (9th Cir. 1989); *In re Ward,* 837 F.2d 124, 126 (3d Cir.1988) (§ 549(c), assumed to be an exception to § 362(a), not available due to lack of recording deed); *Carpio v. Smith (In re Carpio),* 213 B.R. 744 (Bankr.W.D.Mo.1997); *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso),* 211 B.R. 508 (Bankr.E.D.Pa.1997) (same judge later decided otherwise in *Glendenning, infra* note 10); *In re McDonald,* 210 B.R. 648 (Bankr.S.D.Fla.1997); *Little v. Bago (In re Bago),* 149 B.R. 610 (Bankr.C.D.Cal.1993); *see In re Siciliano,* 13 F.3d 748, 751 n. 2 (3d Cir.1994) (dicta); *T.F. Stone Co. v. Harper (In re T.F. Stone Co.),* 72 F.3d 466 (5th Cir.1995) (applying § 549(c) to postpetition tax sale of property of the estate without discussion of § 362(a)); *Schwartz v. United States (In re Schwartz),* 954 F.2d 569, 574 (9th Cir.1992) (dicta); *Sikes v. Global Marine, Inc.,* 881 F.2d 176, 179 (5th Cir.1989) (dicta); *In re Fulmer–Vaught,* 218 B.R. 56, 58 (Bankr.W.D.Mo. 1998) (dicta). *Accord,* 3 COLLIER ON BANKRUPTCY ¶ 362.11[11] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2003); WILLIAM L. NORTON, JR., 3 NORTON BANKRUPTCY LAW AND PRACTICE 2d § 59.5 (Supp. Nov. 2002).

**9.** *In re King,* 35 B.R. 530 (Bankr.N.D.Ga. 1983); *Stone Mountain Acceptance Corp. v. Colevins (In re Colevins),* 13 B.R. 645 (Bankr. N.D.Ga.1981).

Other courts have ruled that § 549(c) is inapplicable to a transfer of property of the estate that occurs in violation of the stay.[10] These courts find that textual, conceptual, and policy reasons compel this determination and note that contrary decisions do not adequately or properly analyze the issue.

A recent example of the cases carefully examining the issue and deciding that § 549(c) is not applicable to a transfer in violation of the stay of § 362(a) is *40235 Washington Street Corp. v. Lusardi,* 329 F.3d 1076 (9th Cir.2003). After noting that other courts disagreed with its conclusion, the Ninth Circuit made the following observation, *id.* at 1083:

> None of these decisions, however, considered the textual, structural, and policy arguments we address [in the opinion.] Most were arrived at without any analysis at all. While numbers are on the side of finding section 549(c) to create an exception, the clear weight of judicial reasoning strongly supports the contrary view. Specifically, so far as we

are aware, every court that has considered the governing legal factors has reached the conclusion we have, that section 549(c) does not create an exception to the automatic stay provision.[11]

Among the decisions the Ninth Circuit referred to as lacking analysis was one from this district, *In re King,* 35 B.R. 530, 531 (Bankr.N.D.Ga.1983).

■ Examination of the analysis in *40235 Washington Street Corp.* and similar cases in the context of the Eleventh Circuit's interpretation of the automatic stay in *Borg–Warner* and *Albany Partners* demonstrates that, as other bankruptcy courts in the Eleventh Circuit have held, the good faith purchaser defense of § 549(c) is inapplicable to a transfer that is invalid because it violates the automatic stay of § 362(a).[12]

Analysis begins with the text of § 362(a). Section 362(a) provides that the filing of a bankruptcy petition operates as a stay, "applicable to all entities" of a

---

**10.** *E.g., 40235 Wash. St. Corp. v. Lusardi,* 329 F.3d 1076 (9th Cir.2003); *Fjeldsted v. Lien (In re Fjeldsted),* 293 B.R. 12 (9th Cir. BAP 2003); *Value T Sales, Inc. v. Mitchell (In re Mitchell),* 279 B.R. 839 (9th Cir. BAP 2002); *Elbar Invs., Inc. v. Pierce (In re Pierce),* 272 B.R. 198, 205–06 (Bankr.S.D.Tex.2001); *Glendenning v. Third Fed. Sav. Bank (In re Glendenning),* 243 B.R. 629 (Bankr.E.D.Pa.2000); *In re Samaniego,* 224 B.R. 154, 163 (Bankr.E.D.Wash.1998); *Smith v. London (In re Smith),* 224 B.R. 44 (Bankr.E.D.Mich.1998); *New Orleans Airport Motel Assocs., Ltd. v. Lee (In re Servico, Inc.),* 144 B.R. 933 (Bankr.S.D.Fla.1992); *see Jones v. Garcia (In re Jones),* 63 F.3d 411, 413 n. 6 (5th Cir.1995), *cert. denied,* 517 U.S. 1167, 116 S.Ct. 1566, 134 L.Ed.2d 666 (1996); *Venn v. Bazzel (In re Lambert),* 273 B.R. 663 (Bankr.N.D.Fla.2002) (§ 549(a) is inapplicable where postpetition tax sale is void as violation of § 362(a)).

**11.** The Ninth Circuit Bankruptcy Appellate Panel earlier had reached the same conclusion. *Fjeldsted v. Lien (In re Fjeldsted),* 293

B.R. 12 (9th Cir. BAP 2003); *Value T Sales, Inc. v. Mitchell (In re Mitchell),* 279 B.R. 839 (9th Cir. BAP 2002). These Ninth Circuit appellate authorities supersede their decisions in the circuit that had indicated that § 549(c) applied to transfers in violation of § 362(a) such as *Thompson v. Margen (In re McConville),* 110 F.3d 47, 49 (9th Cir.1997); *Schwartz v. United States (In re Schwartz),* 954 F.2d 569, 574 (9th Cir.1992); *Walker v. Cal. Mortgage Serv. (In re Walker),* 861 F.2d 597, 600 (9th Cir.1988); *Shaw v. County of San Bernardino (In re Shaw),* 157 B.R. 151 (9th Cir. BAP 1993); and *Jones v. Wingo (In re Wingo),* 89 B.R. 54, 58 (9th Cir. BAP 1988).

**12.** *New Orleans Airport Motel Assocs., Ltd. v. Lee (In re Servico, Inc.),* 144 B.R. 933 (Bankr.S.D.Fla.1992); *see Venn v. Bazzel (In re Lambert),* 273 B.R. 663 (Bankr.N.D.Fla.2002) (§ 549(a) is inapplicable where postpetition tax sale is void as violation of § 362(a)). *Contra, In re McDonald,* 210 B.R. 648 (Bankr.S.D.Fla.1997).

number of specific actions, including "any act to create, perfect, or enforce any lien against property of the estate" and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under [the Bankruptcy Code.]" 11 U.S.C. § 362(a)(4), (5). Subsection (b) then lists 18 exceptions to this automatic stay; section 549(c) is not one of them. The language of § 362, therefore, indicates that § 549(c) is not an exception to transfers that violate § 362(a).[13]

The same conclusion follows from the text of § 549. Section 549(a) permits a trustee to *avoid* certain unauthorized post-petition transfers. Examples include a sale of property outside the ordinary course of business in the absence of compliance with the rules of 11 U.S.C. § 363 and FED. R. BANKR.P. 6004 or, more blatantly (and illegally), a debtor's sale of property after a trustee has been appointed.[14]

Section 549(c) provides a limited defense: "The trustee may not *avoid under subsection (a) of this section* a transfer of real property to a good faith purchaser" if a copy of the bankruptcy petition is not

filed in the appropriate real estate records and its remaining requirements are met. The emphasized language establishes that § 549(c) is not applicable to a transfer in violation of § 362(a) for two reasons. The obvious one is that subsection (c) applies only to an action *under subsection (a)*. An action under § 362(a) for violation of the automatic stay is not an action under § 549(a). The second, related reason is that subsection (c) provides a defense to the *avoidance* of a transfer. A transfer is subject to *avoidance* only if it is a valid and legally effective transfer in the first instance. As noted above, however, a transfer in violation of the stay is *void* or perhaps *voidable;* under either conception, the transfer is invalid and without legal effect, and there is nothing to avoid. The language of § 549(c) thus precludes its application to a transfer in violation of § 362(a).[15]

*Elbar Investments, Inc. v. Pierce (In re Pierce)*, 272 B.R. 198 (Bankr.S.D.Tex. 2001), explains the importance of this language in the context of a judicial tax sale in violation of the stay, *id.* at 207–08:

It is crucial to distinguish between "void"/"voidable," on the one hand, and "avoidable" on the other. *For present*

---

**13.** *Accord, e.g., 40235 Wash. St. Corp. v. Lusardi*, 329 F.3d 1076, 1080 (9th Cir.2003); *Value T Sales, Inc. v. Mitchell (In re Mitchell)*, 279 B.R. 839, 844 (9th Cir. BAP 2002) ("It is obvious that Congress knows how to create an exception to § 362, as it has provided eighteen of them. Transfer of estate property to a BFP is not among them.").

**14.** "Section 549(c) is intended to protect against a fraudulent debtor selling real property to an innocent purchaser who has no knowledge of the pendency of the bankruptcy case." *Smith v. London (In re Smith)*, 224 B.R. 44, 48 (Bankr.E.D.Mich.1998); *accord, e.g.*, 5 COLLIER ON BANKRUPTCY ¶ 549.06 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2003). For an example of an improper transfer by a debtor, see *Brown v. Harris (In*

*re Auxano, Inc.)*, 96 B.R. 957 (Bankr.W.D.Mo. 1989).

**15.** *Accord, e.g., 40235 Wash. St. Corp. v. Lusardi*, 329 F.3d 1076, 1081 (9th Cir.2003); *Value T Sales, Inc. v. Mitchell (In re Mitchell)*, 279 B.R. 839, 843 (9th Cir. BAP 2002); *Elbar Invs., Inc. v. Pierce (In re Pierce)*, 272 B.R. 198 (Bankr.S.D.Tex.2001); *Glendenning v. Third Fed. Sav. Bank (In re Glendenning)*, 243 B.R. 629 (Bankr.E.D.Pa.2000); *Smith v. London (In re Smith)*, 224 B.R. 44 (Bankr.E.D.Mich. 1998); *New Orleans Airport Motel Assocs., Ltd. v. Lee (In re Servico, Inc.)*, 144 B.R. 933 (Bankr.S.D.Fla.1992); *see Venn v. Bazzel (In re Lambert)*, 273 B.R. 663, 668 (Bankr. N.D.Fla.2002) (§ 549(a) is inapplicable where postpetition tax sale is void as violation of § 362(a)).

*purposes,* it can be said that "void" and "voidable" deal with a transaction or occurrence that was invalid or had no legal effect when it occurred, but might be made valid by a subsequent judicial act or ratification.[16] By contrast, the bankruptcy trustee's power to "*avoid*" a transfer is the statutory power to set aside a transaction that was perfectly valid and legally effective when it occurred and remains valid until there is a judicial ruling that sets it aside. The statute specifies the legal principles under which valid transactions may be set aside, and also specifies protections for parties that acted in good faith prior to the time that a court sets aside the transaction. That makes sense since parties *should* be protected from judicial decisions that invalidate transactions that were perfectly proper when accomplished. But obviously no party may rely on a transaction that was invalid when it occurred. Therefore, within the scope of the issues presented in this adversary proceeding, there is no reason to discuss the concept of "good faith purchaser." The [judicial tax sale] was contrary to federal law and was invalid when it occurred. Although it can be made valid by retroactive relief from the stay, no one has a right to rely on the transaction until and unless it is validated by court action.

The texts of both § 362 and § 349, therefore, make it clear that the § 549(c) good faith purchaser defense is not available in an action for violation of the automatic stay of § 362(a).[17]

Concepts underlying the Bankruptcy Code and the bankruptcy court's jurisdiction confirm this conclusion. The bankruptcy court has *exclusive* jurisdiction over property of the debtor and property of the estate under 28 U.S.C. § 1334(e):

> The [bankruptcy court][18] in which a case under title 11 is commenced or pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of the property of the estate.

In *Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), the Supreme Court considered a similar jurisdictional provision in connection with the validity of a foreclosure sale conducted after the filing of a farmer's bankruptcy petition for relief under the Frazier–Lemke Act, which contained provisions staying, among other things, foreclosure actions. The Court found that Congress had vested exclusive jurisdiction of the debtor and his property in the bankruptcy court "with complete and self-executing statutory exclusion of all other courts." *Id.* at 443, 60 S.Ct. 343. Thus, the state court in which the foreclosure had been effected had been deprived of all jurisdiction to proceed, and

---

**16.** The court observed in footnote 21:

Although both "void" and "voidable" deal with transactions or occurrences that were not valid when they occurred, the distinction between them is that if the transaction is absolutely "void," it can never become valid. If it is "voidable" it can be made valid by subsequent judicial decision. Until that decision is rendered, however, it is not valid. These terms apply generally in the law; they are not statutorily defined in bankruptcy law. The important point is that both words deal with

events that were invalid when they occurred.

Other courts have made similar observations. *E.g., Easley v. Pettibone Mich. Corp.,* 990 F.2d 905, 911–12 (6th Cir.1993).

**17.** *See* cases cited *supra* note 15.

**18.** The statute vests jurisdiction in the district courts. Bankruptcy courts then exercise that jurisdiction by referral from the district courts pursuant to 28 U.S.C. § 157(a).

548

all actions based on the court's actions were "without authority of law." *Id.* The Eleventh Circuit followed this case to find that actions in violation of the similarly self-executing stay of § 362(a) are void under the Bankruptcy Code in *Borg–Warner Acceptance Corp. v. Hall,* 685 F.2d 1306 (11th Cir.1982). (Later, in *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670 (11th Cir. 1984), the Eleventh Circuit ruled that § 362(d) permitted bankruptcy courts, "in appropriately *limited* circumstances, to grant retroactive relief from the automatic stay." *Id.* at 675.)

▮ The filing of a bankruptcy case thus vests *exclusive* jurisdiction over the debtor's property in the bankruptcy court so that the bankruptcy court can control its administration. With regard to property, the bankruptcy case is *in rem;* the property of the debtor and of the estate is *in custodia legis.* Such property cannot be removed from the bankruptcy court's exclusive jurisdiction except by appropriate proceedings in the bankruptcy court. Section 362(a) prohibits *involuntary* removal of assets unless permitted by lifting of the stay while other sections (such as § 363 and § 554) provide for the *voluntary* disposition of assets during administration of the case if *authorized.* Section 549(a) provides a remedy for the avoidance of *voluntary* transfers that are *unauthorized,* for which § 549(c) provides protection to good faith purchasers under limited circumstances. Expanding the protections of § 549(c) from unauthorized, *voluntary* transfers subject to *avoidance* under § 549(a) to unauthorized, *involuntary* transfers that are *invalid* under § 362 obviously contradicts the concepts and purposes underlying the two sections.

Policy considerations require this result. The fundamental reason that the Bankruptcy Code and related jurisdictional provisions protect assets of the debtor and the estate is to insure that the assets are fairly and properly administered in accordance with the Bankruptcy Code. This serves two important functions. The frequently recognized function is to provide the debtor a "breathing spell" to permit the debtor to "attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." [19] A sometimes overlooked but equally important reason is to protect *creditors* by avoiding the piece-meal or distressed liquidation of the debtor's assets and a race to the courthouse, thus furthering administration of assets in an orderly fashion to achieve an equitable distribution within the framework of the Bankruptcy Code.[20]

▮ As explained earlier, there is a difference between a transfer that improperly removes an asset from the estate as a result of unauthorized but *voluntary* action

**19.** H.R.Rep. No. 595, 95th Cong., 1st Session 340–42 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6296–97, *cited in, e.g., 40235 Wash. St. Corp. v. Lusardi,* 329 F.3d 1076, 1081 (9th Cir.2003); *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670, 675, n. 9 (11th Cir.1984).

**20.** *See, e.g., Soares v. Brockton Credit Union (In re Soares),* 107 F.3d 969, 975 (1st Cir. 1997); *GATX Aircraft Corp. v. M/V Courtney Leigh,* 768 F.2d 711, 716 (5th Cir.1985); *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.,* 682 F.2d 446, 448 (3d Cir.1982); *Elbar Invs., Inc. v. Pierce (In re Pierce),* 272 B.R. 198, 203–04 (Bankr.S.D.Tex.2001); *Purnell v. Citicorp Homeowners Servs., Inc. (In re Purnell),* 92 B.R. 625, 627–28 (Bankr.E.D.Pa. 1988). *Venn v. Bazzell (In re Lambert),* 273 B.R. 663 (Bankr.N.D.Fla.2002), illustrates the point. There, the chapter 7 trustee was successful in asserting that a postpetition tax sale violated § 362(a), thereby making an asset available for liquidation for the benefit of creditors.

and one that improperly removes an asset through unauthorized and *involuntary* action. The purpose of § 549 is to protect the estate in the former situation when an unauthorized transfer occurs, often because the debtor initiates an unauthorized postpetition transfer.[21] Section 549(a) establishes the general rule that the trustee may avoid such transfers to protect creditors, subject to the protections in § 549(c) for certain innocent purchasers. Section 362(a), in contrast, protects both the debtor and creditors from loss of an asset (or other adverse results, such as entry of a judgment or other collection activity) by the collection activities of creditors attempting to exercise rights before the bankruptcy process even has a chance to work. Section 549 deals with a breakdown in the bankruptcy system once it has begun; section 362, in contrast, operates to insure that assets remain within the bankruptcy court's jurisdiction so that the court can deal with them appropriately.

The two sections thus have quite different purposes, and Congress made a policy choice to provide protections for good faith purchasers only in § 549. As the court pointed out in *Value T Sales, Inc. v. Mitchell (In re Mitchell)*, 279 B.R. 839, 843 (9th Cir. BAP 2002):

> Congress saw fit to protect BFPs in § 549 but not in § 362, presumably expressing its intent to afford greater protection to BFPs who purchase from debtors than to those purchasing at sales violating the automatic stay.[22]

The conclusion that § 549(c) is not applicable to foreclosure sales in violation of the automatic stay is imperative for the proper and efficient administration of bankruptcy cases. Many debtors file their bankruptcy petitions on the "eve of foreclosure," often

the day before, or the morning of, a scheduled foreclosure sale. This may be due to a natural human tendency to put off unpleasant things, to last minute efforts to negotiate a resolution short of a bankruptcy filing to avoid the threatened foreclosure, or to an intentional purpose to give the creditor as little notice as possible. Regardless of the reason, the policies and purposes of the automatic stay and the exclusive jurisdiction of the bankruptcy court over property of the debtor and the estate require that foreclosure actions be stayed.

If § 549(c) operated as an exception to the automatic stay, "last minute" foreclosures that the stay prevents could proceed apace unless the debtor was able to provide actual notice to the creditor or to record the petition in the real estate records prior to the sale. If a creditor did not receive notice or, possibly, proceeded in spite of it, a recording of the petition in the real estate records would be essential to obtain the protections of the stay. Yet, in many instances, if not in every instance, such recording would have little or no practical import in cases where foreclosure takes place on the day after or the day of the bankruptcy filing; it seems unlikely that any foreclosing creditor or purchaser would swing by the record room on the way to the courthouse steps and perhaps even more unlikely that the recording office would have sufficiently processed the recordation so that it would be found even if such a trip were made. The requirement of recording the petition to insure that a stay violation does not result in the loss of an asset would be burdensome on debtors and detrimental to creditors, largely ineffective in any event, and a possible encouragement to foreclosing credi-

---

21. *Supra* note 14.

22. *Accord, 40235 Wash. St. Corp. v. Lusardi,* 329 F.3d 1076, 1082 (9th Cir.2003).

tors to avoid receipt of actual notice or to take their chances on foreclosing and argue about notice and § 549(c) later.

For the foregoing textual, conceptual, and policy reasons, therefore, the Court concludes that § 362(a) renders a transfer of property in violation of its provisions invalid and without lawful effect and that § 549(c) does not provide an exception to such operation of the stay.

The two previous decisions in this district, *In re King,* 35 B.R. 530 (Bankr. N.D.Ga.1983), and *Stone Mountain Acceptance Corp. v. Colevins (In re Colevins),* 13 B.R. 645 (Bankr.N.D.Ga.1981), did not undertake the analysis set forth above. Moreover, it is clear from the facts of each case that the questioned transfers were made without any notice of the bankruptcy filing, were not challenged until some period of time after they took place, and, most critically, resulted in the realization of value at least close to the actual value of the real property as asserted by the debtors. In each case, the facts would have justified the court in annulling the stay under § 362(d). While each decision reaches the correct result on the facts, the more recent authorities such as *40235 Washington Street Corp.* set forth the proper legal analysis. Consequently, the Court declines to follow *King* and *Colevins.*

### 2. Payment of "Present Fair Equivalent Value" by Purchasers.

 Even if § 549(c) were applicable to the transfers in question here, the purchasers would be entitled to its protection only if they demonstrate that they provided "present fair equivalent value" as § 549(c) requires.[23] Defendants had four witnesses at trial, each of whom has substantial experience in the real estate business and none of whom offered any testimony as to value. Indeed, defendants argue that they need not produce any evidence of value. Instead, they assert that the consideration paid at a regularly conducted foreclosure sale establishes, as a matter of law, "present fair equivalent value" for purposes of § 549(c). Defendants rely on *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) and *T.F. Stone Co. v. Harper (In re T.F. Stone Co.),* 72 F.3d 466 (5th Cir.1995).[24]

*BFP v. Resolution Trust Corp.* was an action to avoid a prepetition mortgage foreclosure sale as a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B),[25] which permits a trustee to

**23.** The burden of proving the § 549(c) defense is on the parties claiming it. *E.g.,* FED R. BANKR.P. 6001; *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso),* 211 B.R. 508, 515 (Bankr.E.D.Pa.1997); *Brown v. Harris (In re Auxano, Inc.),* 96 B.R. 957 (Bankr.W.D.Mo. 1989); *Purnell v. Citicorp Homeowners Servs., Inc. (In re Purnell),* 92 B.R. 625, 629 (Bankr. E.D.Pa.1988).

**24.** *In re McDonald,* 210 B.R. 648 (Bankr. S.D.Fla.1997) and *Little v. Bago (In re Bago),* 149 B.R. 610 (Bankr.C.D.Cal.1993), support the contentions of the defendants.

**25.** Section 548(a)(2), as considered in *BFP,* was renumbered in 1998 as § 548(a)(1)(B) in connection with the amendment of § 548(a) to add provisions dealing with charitable contribution. Pub. 105–183, §§ 2, 3(a), 112 Stat. 517, 518 (1998). Citations in the text are to the amended numbering.

As renumbered, § 548(a)(1)(B) provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

(B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was

avoid a transfer of property of a debtor in specified distressed financial circumstances made within one year of the bankruptcy filing if the debtor received less than *"reasonably* equivalent value." The Supreme Court ruled that the consideration paid by a purchaser at a regularly conducted foreclosure sale in accordance with state law was, as a matter of law, "reasonably equivalent value" within the meaning of § 548. Although *BFP* did not involve the different language in § 549(c) of *"present fair* equivalent value," the *Stone* case applied *BFP* to § 549(c) and held that the sale of the debtor's real estate that had a scheduled value of $65,000 at a regularly conducted postpetition tax sale for $325 was for "present fair equivalent value." [26] (The Fifth Circuit in *Stone* did not consider whether the tax sale was an act to enforce a lien against property of the estate in violation of § 362(a)(4), such that § 549(c) would not be applicable as it stated in *Jones v. Garcia (In re Jones)*, 63 F.3d 411, 413 n. 6 (5th Cir.1995) [27]).

Most courts, however, hold that the price paid at a foreclosure sale does not satisfy the "present fair equivalent value" element of the § 549(c) defense, some expressly finding that the analysis in *BFP* relating to prepetition fraudulent transfers under § 548 is not applicable to the postpetition good faith defense in § 549(c) and rejecting the *Stone* analysis.[28] These cases reach the correct result on textual, contextual, and policy grounds.

The obvious difference in language is that § 548(a)(1)(B) refers to transfers for less than *"reasonably* equivalent value" whereas § 549(c) refers to *"present fair* equivalent value." Had Congress intended the concept of "reasonably equivalent value" to govern the rights under § 549(c) of good faith purchasers when an unauthorized transaction takes place to the detriment of the estate and its beneficiaries— the debtor and frequently creditors—it could have done so. That Congress chose different words demonstrates that it had a

---

incurred, or became insolvent as a result of such transfer or obligation;

 (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

 (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

**26.** *Accord, e.g., In re McDonald,* 210 B.R. 648 (Bankr.S.D.Fla.1997); *Little v. Bago (In re Bago),* 149 B.R. 610 (Bankr.C.D.Cal.1993).

**27.** *See Elbar Invs., Inc. v. Pierce (In re Pierce),* 272 B.R. 198, 205 (Bankr.S.D.Tex.2001).

**28.** *E.g., 40235 Wash. St. Corp. v. Lusardi,* 177 F.Supp.2d 1090 (S.D.Cal.2001), *aff'd on other grounds,* 329 F.3d 1076 (9th Cir.2003); (*BFP* not applicable and declining to follow *Stone*); *Shaw v. County of San Bernardino (In re Shaw),* 157 B.R. 151, 153–54 (9th Cir. BAP

1993); *Glendenning v. Third Fed. Sav. Bank (In re Glendenning),* 243 B.R. 629 (Bankr. E.D.Pa.2000); *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso),* 211 B.R. 508, 517–18 (Bankr.E.D.Pa.1997) (*BFP* not applicable and declining to follow *Stone*); *Purnell v. Citicorp Homeowners Servs., Inc. (In re Purnell),* 92 B.R. 625, 629–31 (Bankr.E.D.Pa.1988); *In re Powers,* 88 B.R. 294, 296–97 (Bankr.D.Nev. 1988) ("fair equivalent value" means "either fair market value, or something very close to it"); *see In re Samaniego,* 224 B.R. 154, 164 n. 5 (Bankr.E.D.Wash.1998) (*Stone* is "not convincing") (alternative holding if § 549(c) applies); *Brown v. Harris (In re Auxano, Inc.),* 96 B.R. 957, 963 (Bankr.W.D.Mo.1989). The two decisions in this district that found § 549(c) applicable to a foreclosure sale in violation of the automatic stay both made specific findings that the price paid at the foreclosure sale approximated the actual value of the property. *In re King,* 35 B.R. 530, 533 (Bankr.N.D.Ga.1983); *Stone Mountain Acceptance Corp. v. Colevins (In re Colevins),* 13 B.R. 645, 647 (Bankr.N.D.Ga.1981).

different, more exacting standard in mind. Thus, courts have held that "present fair equivalent value" is considerably more exacting than "reasonably equivalent value" and tolerates little deviation from "fair market value." [29]

Congress had ample basis to make a distinction between the standards in the two sections. There are important, fundamental differences between the contexts and purposes of § 548(a)(1)(B) and § 549(c).

■■■■■ Section 548(a)(1)(B) provides for the avoidance of a transfer that is constructively, even if not actually, fraudulent. Under traditional principles of fraudulent transfer law, "grossly inadequate consideration" is one of the objective facts, called "badges of fraud," that a creditor can prove to establish a presumption of actual fraudulent intent.[30] Section 548(a)(1)(B) goes further in regulating a financially distressed debtor's transfers within a year of a bankruptcy filing by establishing that a transfer *is* avoidable, as constructively fraudulent, if it is for less than "reasonably equivalent value." It thus makes the amount of consideration the conclusive, rather than a presumptive, factor, and elevates the test of the propriety of the transfer, as measured solely by the amount of consideration, from "grossly inadequate consideration" to "reasonably equivalent value."

The use of a lower valuation standard short of "fair" value in § 548 to determine whether to set aside a *legally valid* transfer that takes place *before* the bankruptcy filing brings the property within the exclusive jurisdiction of the bankruptcy court is appropriate in order to take account of the legitimate expectations of the other party to the transfer and the fact that a distressed debtor may not be able to command "fair market value." Section 549, in contrast, deals with the *unauthorized, illegal* transfer that takes place *after* the property is within the exclusive jurisdiction of the bankruptcy court and is protected by the automatic stay. The debtor and creditors are entitled to rely on the protections of the Bankruptcy Code that the asset will be properly administered and not improperly removed from the debtor's estate.[31]

An unauthorized transfer, by definition, is not supposed to take place. When it does, there are two potentially innocent parties—the good faith purchaser and the estate, whose beneficiaries are the creditors and, in rehabilitation cases under chapters 11, 12, or 13, the debtor. In the prepetition fraudulent transfer transaction governed by § 548, however, at least one of the parties, the debtor, is not innocent, and there is no judicial administration of the asset for the benefit of creditors generally.

The two sections thus deal with entirely different problems. Section 549 balances protection of two innocent parties—the good faith purchaser without knowledge of the bankruptcy case on the one hand and the estate, personified in a chapter 13 case by the debtor and in a chapter 7 or 11 case

**29.** *E.g., 40235 Wash. St. Corp. v. Lusardi,* 177 F.Supp.2d 1090, 1099 (S.D.Cal.2001) *aff'd on other grounds,* 329 F.3d 1076 (9th Cir.2003); *Shaw v. County of San Bernardino (In re Shaw),* 157 B.R. 151, 154 (9th Cir. BAP 1993); *Glendenning v. Third Fed. Sav. Bank (In re Glendenning),* 243 B.R. 629 (Bankr. E.D.Pa.2000); *Brown v. Harris (In re Auxano, Inc.),* 96 B.R. 957, 963 (Bankr.W.D.Mo.1989);

*In re Powers,* 88 B.R. 294, 296–97 (Bankr. D.Nev.1988).

**30.** *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 541, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

**31.** *E.g., 40235 Wash. St. Corp. v. Lusardi,* 329 F.3d 1076, 1081 (9th Cir.2003).

by the trustee, on the other. Fairly taking account of the situations of both potentially innocent parties requires that a purchaser, even if otherwise innocent, who has acquired property in an unauthorized transfer at a substantial bargain in a distressed sale context should not be able to retain that bargain at the expense of the other innocent party. Stated conversely, an innocent party who has removed property from the exclusive jurisdiction of the bankruptcy court to the detriment of the estate is fairly entitled to retain the property only if fair value has been paid. An interpretation of "present fair equivalent value" as requiring the innocent purchaser to show actual value achieves this fairness whereas an interpretation that whatever was paid in a regularly conducted foreclosure sale conclusively satisfies the standard does not.

This view is consistent with the remainder of § 549(c), which provides that a good faith purchaser without knowledge of the bankruptcy case who has purchased for less than "present fair equivalent value" as actually determined retains a lien only to the extent of any present value given.

Congress could not have intended that the harm to the estate from an unauthorized transfer in violation of § 549(c) must be compounded by permitting a purchaser to garner a substantial bargain or windfall at a distressed sale at the expense of the estate and its creditors, even if the purchaser otherwise qualifies as a good faith purchaser and has paid adequate legal consideration under state law. The use of

different language in § 548 and § 549, especially when considered in the context of their very different purposes, must mean that § 549(c) does not permit such a result. Indeed, the use of "present fair" indicates an intent that the protection of § 549(c) be limited to truly innocent purchasers who have actually paid a fair price in the transaction.[32]

Finally, if any doubt remains as to whether the price paid at a regularly conducted foreclosure sale constitutes "present fair equivalent value," the doubt must be resolved against such an interpretation. If applicable at all, § 549(c) comes into play as an exception to the automatic stay; as such, it must be construed narrowly.[33]

Examination of *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), interpreting "reasonably equivalent value" under § 548(a)(1)(B) in the context of a prepetition foreclosure sale, shows that its holding and rationale have nothing to do with the completely different language, context, purposes, and policies of § 549(c). The Supreme Court expressed its holding in these words, *id.* at 545, 114 S.Ct. 1757:

> [W]e decline to read the phrase "reasonably equivalent value" in § 548(a)(2) [now § 548(a)(1)(B)] to mean, in its application to mortgage foreclosure sales, either "fair market value" or "fair foreclosure price" (whether calculated as a percentage of fair market value or otherwise). We deem, as the law has always deemed, that a fair and proper price, or a "reasonably equivalent val-

---

**32.** *E.g., 40235 Wash. St. Corp. v. Lusardi*, 177 F.Supp.2d 1090 (S.D.Cal.2001), *aff'd on other grounds*, 329 F.3d 1076 (9th Cir.2003); *Shaw v. County of San Bernardino (In re Shaw)*, 157 B.R. 151 (9th Cir. BAP 1993); *Glendenning v. Third Fed. Sav. Bank (In re Glendenning)*, 243 B.R. 629 (Bankr.E.D.Pa.2000); *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso)*, 211 B.R. 508, 517–18 (Bankr.E.D.Pa.1997).

**33.** *E.g., 40235 Wash. St. Corp. v. Lusardi*, 177 F.Supp.2d 1090, 1099 (S.D.Cal.2001), *aff'd on other grounds*, 329 F.3d 1076 (9th Cir.2003); *Purnell v. Citicorp Homeowners Servs., Inc. (In re Purnell)*, 92 B.R. 625, 629 (Bankr.E.D.Pa. 1988); *see In re Ward*, 837 F.2d 124, 127 (3d Cir.1988).

ue," for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with.

In its discussion of state foreclosure law and fraudulent transfer law that preceded this ruling, *id.* at 540–43, 114 S.Ct. 1757, the Court noted the "black letter" law that "mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside (*under state foreclosure law*, rather than fraudulent transfer law) if the price is so low as to shock the conscience or raise a presumption of fraud or unfairness." *Id.* at 542, 114 S.Ct. 1757 (quotation and citation omitted).

The Court then explained recent developments in bankruptcy law that had altered the relationship between the two bodies of fraudulent transfer and foreclosure law, *id.* at 542–543, 114 S.Ct. 1757:

Fraudulent transfer law and foreclosure law enjoyed over 400 years of peaceful coexistence in Anglo–American jurisprudence until the Fifth Circuit's unprecedented 1980 decision in *Durrett* [*v. Washington Nat. Ins. Co.*, 621 F.2d 201 (1980), which held that a foreclosure sale that yielded 57% of the property's fair market value could be set aside under the predecessor to § 548 in the old Bankruptcy Act and stated in *dicta* that any such sale for less than 70% should be invalidated]. To our knowledge no prior decision had ever applied the "grossly inadequate price" badge of fraud under fraudulent transfer law to set aside a foreclosure sale. To say that the "reasonably equivalent value" language in the fraudulent transfer provision of the Bankruptcy Code requires a foreclosure sale to yield a certain minimum price beyond what state foreclosure law requires, is to say, in essence,

that the Code has adopted *Durrett* or [*In re*] *Bundles* [, 856 F.2d 815 (7th Cir.1988), which rejected the *Durrett* 70% rule in favor of a case-by case analysis of "reasonably equivalent value" in foreclosure sales and established a rebuttable presumption that the foreclosure sale price is sufficient to withstand attack under § 548]. Surely Congress has the power pursuant to its constitutional grant of authority over bankruptcy, U.S. Const., Art. I, § 8, cl. 4, to disrupt the ancient harmony that foreclosure law and fraudulent conveyance law, those two pillars of debtor-creditor jurisprudence, have heretofore enjoyed. But absent clearer textual guidance than the phrase "reasonably equivalent value"—a phrase entirely compatible with pre-existing practice—we will not presume such a radical departure.

The Court went on to express federalism concerns about the impact of ruling that a foreclosure sale could be attacked as a fraudulent transfer under federal bankruptcy law, 511 U.S. at 544, 114 S.Ct. 1757 (quotations and citations omitted):

Federal statutes impinging upon important state interests cannot be construed without regard to the implications of our dual system of government. . . .

It is beyond question that an essential state interest is at issue here: We have said that the general welfare of society is involved in the security of the titles to real estate and the power to ensure that security inheres in the very nature of [state] government. Nor is there any doubt that the interpretation urged by petitioner would have a profound effect upon that interest: The title of every piece of realty purchased at foreclosure would be under a federally created cloud. . . . To displace traditional state regulation in such a manner, the federal

statutory purpose must be clear and manifest.

*BFP* was decided in the context of—and only in the context of—a *prepetition* transfer resulting from a regularly conducted foreclosure sale that is attacked as an allegedly *fraudulent* transfer under § 548. Its central concern is that a reading of "reasonably equivalent value" in § 548 to permit invalidation of foreclosure sales would invade the province of state law governing fraudulent transfers and foreclosures.

BFP's concerns are not implicated in the interpretation of "present fair equivalent value" in § 549(c) for at least two reasons. First, § 549(c) does not deal with fraudulent transfer law; it is, rather, a limited defense to the avoidance of a transfer that is *illegal* and hence avoidable under § 549(a). Second, unlike § 548, § 549 clearly *does* implicate a vital *federal* interest: the exclusive jurisdiction of United States Courts over property of a bankruptcy estate.

Addressing *BFP's* concerns, the district court in *40235 Washington Street Corp. v. Lusardi*, 177 F.Supp.2d 1090 (S.D.Cal. 2001), *aff'd on other grounds*, 329 F.3d 1076 (9th Cir.2003), explained it this way, *id.* at 1102 (citations omitted):

> [T]he disruption of states' interests in § 549(c) is different than § 548. In § 548, the source of the disruption is § 548 itself. Section 548 authorizes the

trustee to set aside prepetition transactions not for "reasonably equivalent value."

In contrast, § 549(c) is not the source of the disruption; § 362(a) is. Section 362(a)(4) enjoins creditors . . . from enforcing liens. The automatic stay prohibits "all foreclosure actions." Section 362(a)'s void rule . . . sets aside the results of state foreclosure sales. As an exception to § 362(a), § 549(c) creates no more interference than that already created by § 362(a). Accordingly, interpreting § 549(c) to require a close-to-fair-market benchmark yields no additional disruption to areas of state regulation. By creating no additional interference, § 549(c) raises none of the comity concerns found in *BFP*.

 Neither the holding nor the rationale of *BFP v. Resolution Trust Corp.* is applicable to interpretation of § 549. (Indeed, *BFP* mentions § 549 only in a footnote listing sections of the Bankruptcy Code that use the word "transfer." [34]) The analysis in *Stone*[35] and other cases [36] applying *BFP's* § 548 holding to § 549 does not properly take account of the differences in the language of the two sections, the drastically different contexts in which they operate, and the fundamentally different purposes they serve. This Court, like other courts that have declined to follow *Stone*,[37] will follow the rule adopted by most other courts: [38] consideration paid at a foreclosure sale does not establish the

---

**34.** 511 U.S. at 543, n. 7, 114 S.Ct. 1757. The dissent cites § 549(c). *Id.* at 550, n. 1, 114 S.Ct. 1757. This Court can find no other Supreme Court case citing § 549.

**35.** *T.F. Stone Co. v. Harper (In re of T.F. Stone Co.)*, 72 F.3d 466 (5th Cir.1995).

**36.** *In re McDonald*, 210 B.R. 648, 650–51 (Bankr.S.D.Fla.1997); *Little v. Bago (In re Bago)*, 149 B.R. 610, 614 (Bankr.C.D.Cal. 1993).

**37.** *40235 Wash. St. Corp. v. Lusardi*, 177 F.Supp.2d 1090, 1101–02 (S.D.Cal.2001), *aff'd on other grounds*, 329 F.3d 1076 (9th Cir.2003); *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso)*, 211 B.R. 508, 518 (Bankr. E.D.Pa.1997); *see In re Samaniego*, 224 B.R. 154, 164 n. 5 (Bankr.E.D.Wash.1998).

**38.** See cases cited *supra* note 32.

existence of "present fair equivalent value" as required by § 549(c).

■ In summary, the Court concludes that, even if § 549(c) is applicable here, FED. R. BANKR. P. 6001 requires defendants to prove the payment of "present fair equivalent value" to invoke the protections of § 549(c) and that this burden is not carried by proof of the price paid at a regularly conducted foreclosure sale. Because purchasers introduced no evidence of value of the residence, the good faith defense of § 549(c) is not available to them.

## C. Annulment of the Stay.

■ Courts determining that a postpetition foreclosure sale is invalid under § 362(a) have noted that creditors or purchasers may seek its annulment under § 362(d).[39] Proper resolution of this matter, therefore, requires the Court to determine whether annulment is appropriate in this proceeding.

In *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670 (11th Cir.1984), the Eleventh Circuit ruled that " § 362(d) permits bankruptcy courts, in appropriately *limited* circumstances, to grant retroactive relief from the automatic stay."[40] *Id.* at 675. The circumstances discussed below are among the factors that courts have deemed important in considering the propriety of retroactive relief in the context of a foreclosure sale in violation of § 362(a).[41]

The Court could not have properly terminated the stay if relief had been sought prior to the foreclosure sale. There is sufficient equity in the residence to protect Mr. Loftin's interests, and it is clearly essential to the reorganization of the Debtor; indeed, the Debtor's primary purpose in filing was to protect it. There is no evidence that the Debtor filed the case in bad faith, that he is a "repeat filer" (his chapter 7 case filed in the early 80's being immaterial for this purpose), or that he cannot propose a confirmable chapter 13 plan. Given these facts, there was no reason for lifting the stay under 11 U.S.C. § 362(d)(1) or (2) upon the filing of the case.

Consideration of other factors provides no basis for retroactive relief. The compelling fact in this proceeding is that, if the stay is retroactively lifted, a 61 year old man with physical and mental difficulties will lose his home in which he has resided for 24 years and in which there is significant equity. He will clearly suffer irreparable injury if the stay is annulled. On the

**39.** *E.g., Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 976–78 (1st Cir.1997); *Jones v. Garcia (In re Jones)*, 63 F.3d 411, 413 n. 6 (5th Cir.1995); *In re Siciliano*, 13 F.3d 748, 750–51 (3d Cir.1994); *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 675 (11th Cir.1984); *Fjeldsted v. Lien (In re Fjeldsted)*, 293 B.R. 12, 21–25 (9th Cir. BAP 2003); *Elbar Invs., Inc. v. Pierce (In re Pierce)*, 272 B.R. 198, 212 (Bankr. S.D.Tex.2001).

**40.** Accord, *e.g., Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 977 (1st Cir.1997) ("[R]etroactive relief from the automatic stay must rest on a set of facts that is both unusual and unusually compelling."); *Elbar Invs., Inc. v. Pierce (In re Pierce)*, 272

B.R. 198, 212 (Bankr.S.D.Tex.2001) ("[R]etroactive annulment of the stay is an extraordinary remedy subject to the broad discretion afforded a bankruptcy judge under section 362." (Citation omitted)); *D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso)*, 211 B.R. 508, 518–20 (Bankr.E.D.Pa.1997); *see Fjeldsted v. Lien (In re Fjeldsted)*, 293 B.R. 12, 21–25 (9th Cir. BAP 2003) (discussing various tests courts have enunciated in considering annulment of the stay, adopting a "balancing of the equities" test, and suggesting factors to be considered in determining whether to grant retroactive relief).

**41.** Cases cited *supra* note 39.

other hand, Defendants have shown no prejudice other than the fact that their transactions will not be given legal effect, and nothing indicates that they cannot easily be restored to the *status quo ante.*

The facts of this case do not demonstrate the existence of the "limited circumstances" that justify annulment of the stay under *Albany Partners* or a basis for determining that equitable considerations, on balance, require such relief. The Court, therefore, will not grant retroactive relief from the stay.

### IV. CONCLUSION

This adversary proceeding was bifurcated for trial for the Court to deal, first and solely, with the questions of whether the defendant has an interest in the residence that is property of his estate, whether the foreclosure sale and subsequent transfer of the property were invalid because they violated the automatic stay, whether the defendants were entitled to invoke the protections of § 549(c), and whether, if the transactions were upheld, the Debtor owed rent to Jefferson. The Court has now determined that the Debtor has an interest in the residence that is property of his estate, that the transactions were invalid because they violated the automatic stay, that § 549(c) does not protect them, and that there is no cause for annulment of the stay. These rulings necessarily mean that Jefferson is not entitled to rent.

The nature of the relief to be afforded to the parties under these circumstances, determination of the amount of the debt owed to Mr. Loftin, and the cross-claims of the defendants among themselves remain for resolution in further proceedings. Once those issues have been resolved, the Court will enter an appropriate judgment providing relief to the Debtor in accordance with this Order and appropriate re-

lief to all of the parties in accordance with the Court's later determinations.

## APPENDIX

In August 1978, Joe Frank Ford, Sr. (the "Debtor") purchased his residence, known as 6 Springdale Drive, Rome, Georgia. In connection with the purchase, Debtor executed two security deeds, a first priority security deed in favor of Home Federal Savings and Loan Association of Rome and a second priority security deed in favor of A.C. Loftin, the foreclosing creditor in this proceeding. The first priority security deed eventually came to be held by First Union Bank ("First Union"). Mr. Loftin's security deed secured a debt in the original principal amount of $6,222.39, payable with interest at 9½ percent per annum in monthly installments, with the last payment being due on January 1, 1997.[42]

In approximately 1981, the Debtor filed a bankruptcy case. At some time thereafter, Mr. Loftin called the Debtor in an effort to collect payments on the debt. The Debtor told Mr. Loftin that the debt had been discharged; Mr. Loftin made a few more calls but then made no further effort to collect until he initiated foreclosure proceedings in April 2002, as described below. There was no evidence with regard to this prior bankruptcy case, but it is a fair conclusion from the evidence that it was a Chapter 7 case and that, therefore, the debt probably was discharged. The discharge of personal liability on the debt, however, did not affect the continuing validity of Mr. Loftin's security deed, and that earlier bankruptcy case, once concluded, would not have prevented Mr. Loftin from initiating foreclosure proceedings.

---

**42.** Plaintiff's Exhibit 1.

The Debtor has lived in the residence continuously for 24 years; from the time he and his family moved in, he has not lived anywhere else. His daughter, Kathy Ford Wright, was 13 when the family moved there and now lives with her husband in their own home.

Ms. Wright testified about the Debtor's physical and mental condition. The Debtor, now 61 years old, has a seventh grade education. He is able to read with difficulty but cannot see without glasses which he chooses not to wear. The Debtor has a variety of physical and mental difficulties: He has a heart condition, suffers from schizophrenia, anxiety, and hallucinations, is on medication for anxiety and nervousness, is an alcoholic (no signs of which were apparent at trial), and has been hospitalized on several occasions within the past year because of medical problems. His sole source of income is social security.

In August 1998, Ms. Wright learned from her uncle that the Debtor was having financial problems, including unpaid credit card bills, and that First Union was foreclosing on the residence. She became concerned about saving her father's house and decided to try to borrow enough money from Nations Bank (now Bank of America) in Cartersville, Georgia (the "Bank"), to pay off First Union and avoid the foreclosure. The Bank told her that it could not make a loan to her father because he did not have sufficient income but that it could make a loan to her if he would transfer title to the residence to her.

Ms. Wright explained this situation to her father, who was previously unaware of the threatened foreclosure. The Debtor was willing to deed the residence to her so she could get the loan, with the under-

standing that she would deed it back to him thereafter. Ms. Wright testified that she planned to provide a life estate to him in order to protect herself if something happened to her father. It is a fair inference from the evidence that she wanted to retain some sort of legal interest in the residence to be able to sell it and pay off the Bank debt if her father passed away. Although the testimony of the Debtor and Ms. Wright was somewhat conflicting as to the precise terms of the interests each was to have and the timing of the reconveyance of the interest to the Debtor, it is clear that both intended that the Debtor have an ownership interest in the residence for at least the rest of his life.

The Debtor gave Ms. Wright a deed to the residence,[43] for which she paid nothing, and she obtained a $15,000 loan from the Bank with the house as collateral.[44] According to Ms. Wright, the Bank did not do a complete title search when this loan was made, and neither the Bank nor Ms. Wright was aware of Mr. Loftin's existing security deed at the time.

Ms. Wright essentially took over the management of the Debtor's finances. She established a bank account in her name for his benefit, deposits his social security check in it, and makes payments on the Bank loan and pays other expenses for him from that account. The current balance on the Bank loan is approximately $12,000, and payments are about $150 per month.

In April 2002, Ms. Wright went to the Bank to obtain another loan because the roof of the house was leaking and it needed new heating and air conditioning. She learned that the Bank had performed a full title search and had discovered Mr. Loftin's prior lien. Also in April, Mr. Loftin

---

43. Plaintiff's Exhibit 2.

44. Plaintiff's Exhibit 14.

commenced proceedings to foreclose and gave notice to both the Debtor and Ms. Wright;[45] Mr. Loftin had given no prior written notice or demand, apparently because the debt had already matured.

Ms. Wright contacted Mr. Loftin about paying the debt, the amount of which appears to be in dispute and will be resolved in subsequent proceedings. Mr. Loftin and Ms. Wright did not discuss the ownership arrangements that existed between her and her father. Mr. Loftin declined to stop the foreclosure proceedings, and Debtor filed his bankruptcy petition on April 29, 2002.[46]

The Debtor filed his schedules and statement of financial affairs with the petition. Schedule A states that the Debtor owns no real property; Schedule D lists Mr. Loftin's claim in the amount of $9,639 and states that it is secured by a "lien on daughter's residence." [47] The debt to Mr. Loftin is the only debt listed in these original papers. On June 3, 2002, the Debtor amended the schedules to reflect his ownership interest in the residence and to add the Bank as a secured creditor.[48]

The testimony shows that the papers originally filed in this chapter 13 case were prepared after the Debtor spent about an hour with his attorney, that the Debtor had been unable to read them, that Ms. Wright had read them to him, and that he had then signed them. It is clear that the very purpose of filing the Chapter 13 petition was to prevent foreclosure on the residence that the Debtor thought he owned and to pay the debt through a chapter 13 plan. Indeed, because the only debt originally listed was the claim of Mr. Loftin, which presumably had been discharged in the earlier bankruptcy case decades ago, there could be absolutely no purpose in filing the chapter 13 case other than protecting his residence that, until recently, he and his daughter thought was owned free and clear except for the debt to the Bank; the fact that record title remained in the daughter's name was of no importance to them and, in fact, was desirable inasmuch as it would permit her to borrow additional funds for his benefit.

The Debtor's actions in filing the case are, therefore, thoroughly consistent with his and his daughter's testimony that he was to retain an ownership interest notwithstanding the transfer of record title to his daughter. It is clear from the evidence that the Debtor intended to file bankruptcy with the purpose and intent of obtaining relief under Chapter 13 to stop the imminent foreclosure of what he thought was his house and to propose a plan to pay the debt.

Moreover, it is clear that the Debtor did not, and could not, understand the legal intricacies concerning ownership of his residence. Similarly, Ms. Wright, though she has a college education, could not be expected to understand how to present the facts surrounding the transactions for purposes of filling out bankruptcy papers. It is a fair inference from the evidence that, as argued by the Debtor's counsel, the original papers were hurriedly and perhaps carelessly prepared so that they reflected record ownership rather than the actual beneficial ownership that the Debtor legally had; the later amendment then accurately set out that interest. It is a compelling inference from all of the evidence that the original papers do not reflect the actual facts of the transactions

---

**45.** Plaintiff's Exhibit 7.

**46.** Plaintiff's Exhibit 3.

**47.** Plaintiff's Exhibit 3, Schedules A and D.

**48.** Plaintiff's Exhibit 4.

and understandings between the Debtor and his daughter due to errors that are not fairly attributable to them.[49]

The facts of this case demonstrate plainly that attorneys make mistakes in the preparation of legal documents. As discussed below, neither of the deeds on which the ultimate purchaser relies are legally effective because they do not convey title to an existing legal entity.[50] In view of the intent of the parties, those legal errors presumably may be cured through corrective deeds or reformation.[51] Errors in bankruptcy papers are also correctable through amendment.[52] If errors in the preparation of routine deeds made by parties and compensated counsel who have regularly engaged in the real estate business for years are not fatal, neither are errors in bankruptcy papers made by counsel who represents a debtor without a retainer[53] where prompt filing is essential.

The Court has carefully weighed the evidence with regard to the Debtor's contention that he has a beneficial ownership interest in his residence. The testimony of the Debtor and his daughter, Ms. Wright, clearly establishes that the Debtor transferred record title to the residence to his daughter for no consideration so that she could obtain a loan for his benefit to prevent its foreclosure and that he was to retain a beneficial ownership interest in it notwithstanding the conveyance of legal title to her. Everything that they did, and everything that they said, is consistent with that purpose and intent at the time of the transaction.

The only contrary evidence is the original bankruptcy papers that the Debtor filed. Those papers are, however, subject to amendment as of right. Taking into account the demeanor and testimony of the Debtor and Ms. Wright and all of the circumstances, the Court finds their testimony to be entirely credible and to provide clear and convincing evidence establishing that the Debtor conveyed record title to Ms. Wright for no consideration so that she could obtain a loan for his benefit, that she did obtain such a loan, and that the parties intended that she convey at least a life estate ownership back to him.

Defendants suggest that the dispute in this proceeding could have been avoided if either Ms. Wright had transferred record title back to the Debtor or she had filed her own bankruptcy petition. Defendants appear to suggest that the failure of the Debtor or his daughter to do either somehow indicates that they invented their testimony after the filing of the petition in order to prevent the consequences of the foreclosure. The argument proves too much: if cunning and deviousness are to be attributed to the Debtor or Ms. Wright, the alternatives the Defendants suggest could have been more cunning and more devious. Perhaps, however, the Debtor's attorney was aware that a bankruptcy court could construe the transfer of record title to property to a debtor shortly before a bankruptcy filing to show bad faith that requires dismissal of the bankruptcy case or that the automatic stay does not apply to prevent foreclosure of property that a debtor does not own. Transfer of record

49. *See D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso)*, 211 B.R. 508, 510, 515 (Bankr. E.D.Pa.1997).

50. *See* Daniel F. Hinkel, Pindar's Georgia Real Estate Law and Procedure § 19–15 (5th ed.1998).

51. *See id.* § 19–137.

52. Fed. R. Bankr.P. 1009(a).

53. Plaintiff's Exhibit 3, Disclosure of Compensation of Attorney for Debtor.

title to the Debtor on the eve of his bankruptcy filing may have posed the former problem, while a filing by Ms. Wright would not have prevented foreclosure if, as the Debtor contends, the entire interest in the property was to be reconveyed to him after the loan was made such that she would have no ownership interest.[54] The candid, although originally erroneous, presentation of the situation to the bankruptcy court as it existed without any strategic attempt to artificially improve the legal position actually supports the credibility of the Debtor and his daughter.

Mr. Loftin had been in communication with Ms. Wright and must have known that, despite Ms. Wright's ownership of record title, the Debtor still lived in the residence. Their discussions included Ms. Wright's proposals for dealing with the debt but not the question of title. Later, Mr. Loftin knew the Debtor had filed a chapter 13 case, which must have been to prevent foreclosure on the residence. Surely Mr. Durham, his attorney, knew these things as well. A bankruptcy filing by a person who owes a debt secured by a residence he has lived in for 24 years should raise some concern as to whether the resident has some claim of ownership, even if the topic has not come up in discussions about paying the debt.[55] The evidence shows no inquiry directed to bankruptcy counsel, nor does it show that Mr. Loftin, Mr. Durham, or anyone else ever asked the Debtor under what claim he occupied the residence.

Mr. Loftin and his attorney, J. Bryant Durham, Jr., had actual notice of the filing of Debtor's bankruptcy case prior to the scheduled foreclosure date, May 7, 2002. On the morning of the foreclosure, Mr. Charles Griffin, who has been in the real estate business for 38 years, was in Mr. Durham's office and learned that Mr. Durham was preparing to foreclose Mr. Loftin's security deed. Mr. Griffin asked Mr. Durham to let him go by the property and decide if he might want to bid on it, in Mr. Griffin's words, "on a whim." Mr. Griffin drove by the property and called Mr. Rick Miller, the principal of the first purchaser, The L & R Company of Rome, Inc., about buying it.

Mr. Miller is in the real estate business and buys and sells properties every month. Mr. Miller authorized Mr. Griffin to purchase the property at the foreclosure sale.

At the foreclosure sale, Mr. Loftin bid the amount of his debt, which he testified was about $18,000 to $19,000.[56] Mr. Loftin said that he was outbid by Mr. Griffin. Mr. Loftin has known Mr. Griffin for years, but he testified he did not know whether Mr. Griffin was bidding for himself or for someone else. Mr. Griffin was the successful bidder, and Mr. Loftin subsequently executed a deed under power to L & R Corporation of Rome, Inc., for a stated purchase price of $19,653.70.[57] The grantee in this deed, "L & R Corporation of Rome, Inc.," is not a legal entity; the correct grantee is "The L & R Company of Rome, Inc." No corrective deed has been executed.

**54.** *E.g., Everchanged, Inc. v. First Nationwide Mortgage Corp. (In re Everchanged, Inc.),* 230 B.R. 891 (Bankr.S.D.Ga.1999).

**55.** *See D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso),* 211 B.R. 508, 515–16 (Bankr. E.D.Pa.1997).

**56.** The amount of the debt is one of the issues reserved for later determination, and the Court makes no finding as to the amount of the debt.

**57.** Plaintiff's Exhibit 8.

Shortly after L & R's purchase, Mr. Griffin called Dr. Avery, a medical doctor and a real estate investor who owns some 30 investment properties. Dr. Avery has known Mr. Griffin for 25 years and has bought ten to 20 properties from him. Dr. Avery is the principal of Jefferson Associates, L.L.C., which purchased the Debtor's residence for $31,000. The warranty deed was executed by "L & R Corporation of Rome, Inc." (which is not a legal entity) as grantor, in favor of "Jefferson & Associates, LLC" (which is also not a legal entity, the correct grantee being "Jefferson Associates, L.L.C.").[58] No corrective deed has been executed. In connection with the purchase, Dr. Avery paid Mr. Durham for a title search.

The Court notes a common thread running through the foreclosure by Mr. Loftin, the purchase of the residence at the foreclosure sale by Mr. Miller's company, L & R, and the subsequent sale by L & R to Dr. Avery's company, Jefferson: the active participation of Mr. Durham and Mr. Griffin. Mr. Griffin's presence in the office of Mr. Durham—who knew of the bankruptcy filing—indicates either an attorney-client relationship in other matters, regular social acquaintance, or a regular business relationship, such as discussing and developing possible acquisitions of properties that are scheduled for foreclosure. When the topic of conversation turned to foreclosure of the Debtor's residence, the conversation could plausibly have included an explanation of the circumstances surrounding the debt and the foreclosure, including the filing of bankruptcy by the Debtor and his continued occupancy of the residence.

Mr. Griffin's testimony on this point was inconclusive. He first testified that he had no knowledge of the filing; when pressed on cross-examination, however, he testified that he "did not recall" whether he knew about the chapter 13 filing. Under all of the circumstances, it is more probable than not that Mr. Griffin knew of the bankruptcy filing and the Debtor's occupancy of the residence.

Mr. Griffin and Mr. Durham participated in the foreclosure sale as agents, respectively, for the purchaser and the seller. Thereafter, Mr. Durham presumably prepared and recorded the deed under power of sale, as evidenced by his law firm's name on the recorded deed. In this respect, Mr. Durham was acting in some capacity on behalf of the purchaser, L & R. From these circumstances, L & R had knowledge, through its representatives, of the bankruptcy filing and the Debtor's occupancy of the residence.

Mr. Griffin and Mr. Durham continued their participation in the sale to Jefferson. Mr. Griffin's exact role is unclear, but it is undisputed that he suggested the property to Dr. Avery. Jefferson paid Mr. Durham for a title examination, and Mr. Durham presumably prepared and recorded the deed from L & R to Jefferson, as evidenced by his firm's name thereon. Although Dr. Avery may not have known of the filing of a chapter 13 case by the occupant of the residence, Mr. Durham, who performed the title work on Jefferson's behalf, did. Whether or not Mr. Durham communicated these facts to Dr. Avery, Jefferson is charged with notice of them under these circumstances.

Debtor's schedules show a value of $60,000 for the residence.[59] The Debtor testified that he thought the residence was

---

58. Plaintiff's Exhibit 9.

59. Plaintiff's Exhibit 4.

appraised for tax purposes for $55,000 and that he thought it was worth at least $40,000. None of the four witnesses experienced in the real estate business, each of whom dealt with this property for their own purposes (to wit, Mr. Loftin, Mr. Griffin, Mr. Miller, and Dr. Avery) offered any evidence of its value, despite their assertion that the purchasers are "good faith purchasers" for "present fair equivalent value" under 11 U.S.C. § 549(c).